

**U.S. Department of Justice**
*United States Attorney's Office*
*District of New Jersey*

---

*Camila A. Garces*                    *970 Broad Street, Suite 700*        *Direct Dial: (973) 297-2056*
*Assistant United States Attorney*    *Newark, New Jersey 07102*

February 5, 2026

<u>**Via ECF & E-Mail**</u>

The Honorable José R. Almonte
United States Magistrate Judge
Martin Luther King, Jr. Federal Building and United States Courthouse
50 Walnut Street
Newark, New Jersey 07102

      **Re:** ***United States v. Tomas-Kaan Jimenez-Guzel***
              **Mag. No. 25-11260 (AME)**

Dear Judge Almonte:

    Defendant Tomas-Kaan Jimenez-Guzel ("Jimenez-Guzel")[1] seeks pretrial release pursuant to 18 U.S.C. § 3142. *See* Docket Entry ("D.E.") 17. For the reasons outlined herein, the Government respectfully requests that the Court deny Jimenez-Guzel's request.

## I.    Preliminary Statement

    As laid out in a detailed, 47-page Complaint,[2] Jimenez-Guzel was arrested on November 4, 2025 at the Newark Liberty International Airport ("Newark Liberty") as he prepared to depart on a flight to Turkey and eventually reach ISIS-held territory in Syria. His arrest at the airport disrupted what would have been the culmination of months of planning, in concert with co-conspirators in the United States and overseas. Just days before, Jimenez-Guzel had accelerated his travel plans after learning that his associates in Dearborn, Michigan, other ISIS supporters whom he had visited earlier that summer, had been arrested and charged in relation to an armed attack they had been planning on behalf of ISIS in the United States—an

---

[1] The first page of the Complaint includes the name "Tomas-Kaan Jimenez-Guzel" as the defendant's name in the case caption. According to the defense, Jimenez-Guzel's first name is "Tomaskaan." (Def. Br. n.1). However, Jimenez-Guzel's New Jersey driver's license and United States passport reflect "Tomas-Kaan" as his first name.

[2] The Complaint is attached hereto as Exhibit A.

1

attack about which Jimenez-Guzel said he had knowledge. When he was stopped by law enforcement at the airport, Jimenez-Guzel was not only rushing to join ISIS in Syria, but he was also running from "the feds," whom he said were "gonna be looking for us soon."

In furtherance of his plans and agreement with others to join ISIS as a fighter abroad, about which he communicated with his co-conspirators since at least July 2025, Jimenez-Guzel took multiple other affirmative steps beyond those described above, including, but not limited to: 1) engaging in physical training; 2) communicating with a smuggler to seek assistance reaching Syria from Turkey for himself and his co-conspirators; 3) obtaining and packing supplies that he would need while in Syria such as tactical bags, cash, a universal power adaptor, and a solar charger; 4) providing $500 to his Co-Defendant Saed Ali Mirreh ("Mirreh") to help Mirreh purchase a ticket to Turkey; 5) acquiring bus tickets for travel in Turkey from Istanbul, the arrival destination of his flight, to Gaziantep, a city near the Turkey-Syria border well known as transit point for those seeking to reach ISIS.

And while Jimenez-Guzel had taken these steps in furtherance of his ISIS travel plans in the months leading up to his November 2025 arrest, he had been on law enforcement's radar since October 2024, when he was interviewed by the FBI after making online posts suggesting that America would be the site of a terrorist attack. Notwithstanding interviews by the FBI of Jimenez-Guzel (and his mother and father) at that time, over the course of the following year, Jimenez-Guzel's concerning behavior only escalated. For example, in April 2025, Jimenez-Guzel expressed a desire to commit violence against others online, making comments such as "I'm about to" "[k]ill someone[.]" and "I'm going to the local synagogue," and threatening another individual by telling him that he was going to rape him in front of his father. The next month, in May 2025, Jimenez-Guzel posted an image online of a document that encouraged Muslims to practice the obligation of jihad[3] in violent terms, terrorizing the disbelievers to avenge their Muslim brothers. It also urged the use of knives, axes, and vehicles to attack Christians and Jews, and suggested that all that was needed was a knife, hammer, or even less to cause chaos and destruction on a large scale across Europe and America.

Based on all this conduct, Jimenez-Guzel is charged with attempting and conspiring to provide material support or resources to ISIS, a designated foreign terrorist organization ("FTO") that remains one of the most deadly groups in the world—indeed, approximately a month after Jimenez-Guzel's arrest, a gunman believed to be part of ISIS killed two U.S. soldiers and a civilian interpreter in Syria.[4]

---

[3] "Jihad" is an Arabic term meaning struggle or striving in the way of God. It is frequently used to describe a holy war against the enemies of Islam.

[4] CBS News, "Shooter who killed U.S. military personnel in Syria believed to be ISIS infiltrator working with security forces, multiple sources say," Dec. 15, 2025, https://www.cbsnews.com/news/

These charged offenses give rise to a presumption of detention in Jimenez-Guzel's case, a presumption that is strengthened by the proffered evidence of Jimenez-Guzel's risk of flight and danger to the community, as further described in the Complaint and herein. His request for pretrial release on bond should be denied.

## II.    Procedural History

On November 5, 2025, based, in part, on the aforementioned information, Jimenez-Guzel and Mirreh were charged by complaint with conspiring to provide material support or resources to an FTO, ISIS, from a date unknown, but by at least on or about July 24, 2025, to on or about November 4, 2025, in violation of Title 18, United States Code, Section 2339B(a)(1) (Count One). *See* Exhibit A. Jimenez-Guzel was also charged with attempting to provide material support or resources to ISIS from on or about October 4, 2024, to on or about November 4, 2025, in violation of Title 18, United States Code, Section 2339B(a)(1) (Count Two). *See id.*

On that same date, Jimenez-Guzel appeared before the Honorable André M. Espinosa, U.S.M.J., for an initial appearance. D.E. 3. Jimenez-Guzel consented to detention with the right to make a bail application at a later time. D.E. 7. On February 2, 2026, Jimenez-Guzel filed the instant request for release on bail. D.E. 17.[5] Pretrial Services recommends that Jimenez-Guzel remain in detention.

## III.    Facts[6]

As previously stated, beginning in at least July 2025, through online encrypted messaging applications, Jimenez-Guzel and Mirreh communicated with each other and other co-conspirators located in the United States and overseas regarding their agreement and plans to travel to the Middle East—ultimately "sham"[7] or Syria—for the purpose of joining ISIS and fighting on ISIS's behalf.

---

us-troops-ambush-syria-isis/.

[5] On November 5, 2025, Co-Defendant Mirreh appeared before the Honorable Michelle L. Peterson, U.S.M.J., in the Western District of Washington for an initial appearance and was detained after a detention hearing. *See* 25-mj-708 (MLP), D.E. 5, 8. Mirreh was remanded to the custody of the United States Marshals Service ("USMS"), and ordered removed to the District of New Jersey. On November 7, 2025, to facilitate the parties ongoing negotiations about a potential transfer of these proceedings to the Western District of Washington under Federal Rule of Criminal Procedure 20, Judge Peterson issued an order directing USMS not to transport Mirreh to the District of New Jersey until further order. D.E. 13. To date, Mirreh remains detained.

[6] This section sets forth facts from the Complaint, and additional information revealed from the investigation. For the sake of brevity, the Government will not reiterate the entirety of the Complaint.

[7] "Sham" is an Arabic word that refers to the historical region known as greater Syria. This region includes modern day Syria, Lebanon, Jordan, Palestine, and parts of southern Turkey.

Over the course of nearly three and a half months,[8] Jimenez-Guzel, Mirreh, and other co-conspirators agreed to, and discussed, comprehensive plans to complete hijrah[9] and join ISIS as fighters in or around November 2025. Jimenez-Guzel, Mirreh, and others also discussed, among other things, detailed travel plans, physical training, weapons including firearms and improvised explosive devices ("IEDs"), and how to avoid detection by law enforcement. The communications included, among other things: a photograph of Jimenez-Guzel in front of the ISIS flag while holding a knife, Jimenez-Guzel volunteering to be the individual to commit beheadings, and Mirreh and Jimenez-Guzel stating that they each took an oath, likely referring to an oath of loyalty to ISIS.

On or about July 19, 2025, Jimenez-Guzel sent videos of apartment options in a group chat. The next day, on or about July 20, 2025, Jimenez-Guzel sent a photograph to a confidential human source. The photograph shows an individual, whose face is obscured but appears to be Jimenez-Guzel, sitting in front of what appears to be an ISIS flag while wearing a shoulder holster that is designed to conceal and carry firearms, and holding a knife upright in his left hand while raising his right index finger, a gesture often used by ISIS supporters and in ISIS propaganda:



On that same date, in an online group chat, he also sent the below photograph which shows an individual, whose face is obscured but appears to be Jimenez-Guzel, holding a gun upright in his right hand, as well as a video of himself doing pullups.

---

[8] As detailed in the Complaint, during this time, Jimenez-Guzel was located within the United States, including, but not limited to, New Jersey, and Turkey. He was in Turkey from approximately July 4, 2025 to August 20, 2025.

[9] "Hijrah" is an Arabic term that refers to migration, but which is often used by those with extremist views to describe a foreign fighter's journey abroad to fight the enemies of Islam.



The next day, on or about July 21, 2025, in a different group chat, Jimenez-Guzel sent a video of himself engaging in physical training on a mat, a video of himself at a shooting range, and a picture of a sniper. And the next day, he sent names of cities where they could live, as well as pictures and maps of cities.

However, Jimenez-Guzel's behavior was not limited to sending messages, videos, and photographs to others. He put action behind his words in an effort to accomplish his goal of traveling and providing himself and others as support for ISIS. For example, Jimenez-Guzel's cell phone, which was seized on November 4, 2025 and searched pursuant to a search warrant, revealed that Jimenez-Guzel possessed photographs containing information on:

- a day in the life of an ISIS soldier. Below is the photograph:



- the border from Turkey to Syria and how to cross that border. Below are photographs:





- traveling to Syria. Below is a photograph of responses from an artificial intelligence search engine:





Also, Jimenez-Guzel's laptop computer, which was seized on November 4, 2025 from the backpack that he possessed at Newark Liberty and searched pursuant to a search warrant, revealed that Jimenez-Guzel possessed a 50-page how-to guide regarding traveling to join ISIS, also known as the Islamic State. Below is a screenshot of the guide's cover page:



The Turkish city of Gaziantep, which Jimenez-Guzel had a bus ticket to from Istanbul at the time of his arrest, is on the cover of this guide. The guide, in turn, depicts Gaziantep's location in the vicinity of a known transit point from Turkey to Syria. Among other things, the guide includes chapters labeled: "[h]ow Islamic State members get into & out of Syria," "INDEPTH Hijrah Advice 1: SUGGESTED SETUP FOR PACKING," "Hijrah Advice 3: GETTING STOPPED IN TURKEY," "How Operatives Get Through Airport Security Without Blowing Their Cover," "Abu Rumaysah skips his bail conditions and escapes the UK by Bus," and "Stories of Arab Fighters Migration to Syria."

Moreover, the investigation has revealed that on or about October 6, 2025, Jimenez-Guzel visited a website that contained a report about smugglers helping ISIS fighters escape across the Syria-Turkey border. He also visited a website that discussed whether it is permissible in Islam to take a human life, and a website on a

suicide bombing. The investigation also revealed that Jimenez-Guzel ran searches on Google for information regarding the Syria-Turkey border and Gaziantep, Turkey, the Turkish city near the border that is a known transit point for those seeking to reach ISIS; ISIS battles; executions; and Jihadi John.[10]

Jimenez-Guzel took additional concrete, affirmative steps later in October.  On or about October 27, 2025, Jimenez-Guzel purchased an airline ticket to depart from Newark Liberty to Istanbul, Turkey on or about November 17, 2025. Additionally, the day before purchasing his own ticket, on or about October 26, 2025, Jimenez-Guzel transferred a total of $500 through Apple Cash[11] to his charged co-conspirator, Mirreh. Two days later, on or about October 28, 2025, Mirreh purchased an airline ticket to depart from Seattle-Tacoma International Airport ("Seattle-Tacoma") to Istanbul, Turkey on or about November 16, 2025.

As described in the Complaint, after other individuals residing in Dearborn, Michigan, with whom Jimenez-Guzel and Mirreh were communicating, were arrested on October 31, 2025, and charged with offenses related to those individuals' plot to carry out an armed attack in Michigan on behalf of ISIS, Jimenez-Guzel, Mirreh, and their co-conspirators accelerated their travel plans.

In particular, the FBI made arrests in relation to the Michigan attack plot on October 31, 2025, which made national news coverage that day and in the days immediately thereafter.[12] And on November 3, 2025, the original complaint charging one of Jimenez-Guzel's associates and others in Dearborn, Michigan with a violation of 18 U.S.C. § 924(h) (receiving and transferring, and attempting to transfer firearms and ammunition and having reasonable cause to believe that the firearms and ammunition would be used to commit a Federal crime of terrorism) was unsealed in the Eastern District of Michigan ("the EDMI complaint"). *See United States v. Ali, et al.*, 25-cr-20842 (E.D.M.I.), D.E. 1.[13] Jimenez-Guzel's activity in connection with the criminal conduct charged was set forth in detail in the EDMI complaint.

---

[10] Jihadi John is a British militant who appeared in several videos produced by ISIS showing the beheadings of captives in 2014 and 2015.

[11] Apple Cash is a digital cash card integrated into the Wallet app on Apple devices that allows individuals to send, receive, and spend money.

[12] *See, e.g.*, CNN, "AK-47s, online chats and a 'pumpkin day' reference lead FBI to avert a potential ISIS-inspired terror attack," (Oct. 31, 2025), *available at* https://www.cnn.com/2025/10/31/us/michigan-potential-terrorist-attack-averted-fbi; NBC News, "FBI foiled a 'potential terrorist attack' in Michigan planned for Halloween weekend, Director Kash Patel says," (Oct. 31, 2025), *available at* https://www.nbcnews.com/news/us-news/fbi-foiled-potential-terrorist-attack-michigan-planned-halloween-weeke-rcna241081.

[13] The Government later filed an amended complaint in the EDMI case on November 5, 2025, adding an additional defendant, as well as an additional charge alleging that the EDMI defendants conspired to provide material support or resources to ISIS in violation of Section 2339B. *See Ali*, 25-cr-20842,

As described there, Jimenez-Guzel (referred to as "Co-conspirator 1" in the EDMI complaint), visited Dearborn, Michigan between June 30, 2025 and July 2, 2025, staying at the residence of one of the EDMI defendants, whom Jimenez-Guzel knew as "Bukhari," and also meeting with another individual there, whom Jimenez-Guzel knew as "Athari." Jimenez-Guzel left for Turkey shortly after his visit to Michigan and on a subsequent July 27, 2025 group call while Jimenez-Guzel was overseas, Mirreh told Jimenez-Guzel and their other co-conspirators that while he tried to convince "Athari" and "Bukhari" to join their planned travel to Syria, "Athari" and "Bukhari" said they were going to stay back and do the "same thing as France." Just prior to this comment, Jimenez-Guzel told the group, "Yeah we're not coming back, bro we are gonna die there [in Syria] Inshallah …  unless the Amir [ISIS commander] sends you to Paris for a 2015," referring to the November 13, 2015 ISIS terrorist attacks at a music club and other venues in Paris. In the same conversation, Jimenez-Guzel asked whether "Athari" and "Bukhari" were "actually going to do that" (a Paris-style terrorist attack), to which Mirreh responded that they would "as soon as we get a commander. If we don't then they are gonna wait." Jimenez-Guzel said that if "Athari" and Bukhari" were going to conduct a terrorist attack, they would have to wait until after "we leave," because Jimenez-Guzel was at "their" house and "they are going to know who I am. I'm cooked." Jimenez-Guzel also said, "knowing Athari, its [sic] probably going to be at like a club, a disco."

Notably, later during that same group call, Jimenez-Guzel suggested that he was going to commit a domestic terrorist attack if he and Mirreh could not leave the U.S. to accomplish their goal of joining ISIS. Jimenez-Guzel told Mirreh: "I think we're gonna be fine . . . think of it like this . . . if they take your passport, and you can't leave the country, I'm doing, I'm doing what Athari is gonna do, if that happens." Accordingly, contrary to the defense's claims, Jimenez-Guzel was willing to commit violence in the United States. During that call, Jimenez-Guzel also discussed his mother and the potential for his arrest, stating: "[My mother] knows my ideology . . . she knows . . . like she knows I'm cooked like if I go back [to the United States] . . . she thinks I'm gonna like learn a lesson. She thinks if I get arrested, I'm gonna like learn my lesson. I'm not gonna learn my lesson." Jimenez-Guzel then laughed. As his statements during that call make clear, Jimenez-Guzel believes he can hide his criminal conduct from his parents. Indeed, he was successful in hiding it from them for over a year after his parents were first interviewed by the FBI in October 2024.

The EDMI complaint also describes a later group call on September 22, 2025, where Jimenez-Guzel was asked if another member of the group was going to travel with them to Turkey. Jimenez-Guzel replied that the other member planned to travel, but "has to deal with something first," then added, "It's just getting a bit risky for him because … I don't want to say anything on this call but … There's going to be brothers doing something else while we go … Like a nice surprise. That's all I'm going to say

---

D.E. 17. The defendants named in that amended complaint were indicted on those same offenses on November 12, 2025. *See id.*, D.E. 36. The EDMI complaint is attached hereto as Exhibit B.

… So once that happens … the, the moment that happens, and if I'm still here then, thing are gonna … Basically yea. So like a lot of stuff is going to be happening …" Based on the context of this call and Jimenez-Guzel's statements, it is clear that Jimenez-Guzel was referencing the same attack plot he was already aware "Athari" and "Bukhari" were plotting.

And in another group call on October 3, 2025 that included Jimenez-Guzel, Mirreh, and others who agreed to travel to Syria to join ISIS, one of the other co-conspirators suggested that they "could attend the shooting range once, twice, three times practice with toys a few times … it's all subject to the decisions and the command of the Emir." The same co-conspirator then stated, "I'm even thinking of pulling an Athari, but probably not here [in the United States], probably over there." Mirreh later responded, "Dude the thing with Athari is right is um, it would have been bad if I don't know, Subhanallah [Arabic for "glory be to Allah"]. Whatever, whenever we do our thing our first thing then he will do his you know? … We're ginna give them the Tazkiyah."[14]

The above communications involving Jimenez-Guzel, Mirreh, and others regarding the Michigan attack plotters were included in the EDMI complaint that was unsealed on November 3, 2025, on the heels of the national news coverage following the October 31, 2025 arrests. On or about November 3, 2025, Jimenez-Guzel re-booked his flight from Newark Liberty to Istanbul, Turkey to depart instead on or about November 5, 2025 (in the early morning hours, shortly after midnight on November 4, 2025).

During a call with a confidential human source on that same day, Jimenez-Guzel stated that he would be traveling to Turkey on an earlier date. He also stated that not only was he aware of the EDMI complaint, he also knew the individuals who were charged, stating: "[t]hey were planning to do something. I'm not gonna say what, but do something here." In particular, he stated:

> [t]here's a lot of urgent stuff we need to speak about…We need to speak; it's very urgent…so you know what happened in Dearborn?... our names are in the…thing [the EDMI complaint]. The feds are gonna be looking for us in a week maybe, so we are leaving today or tomorrow…we are leaving, akhi, immediately…we have a new ticket, we got one today…we are all leaving soon…five of us are in the article and the feds..they're gonna be looking for us soon. IF we don't leave, we are cooked. We are done…tomorrow, we are leaving. We are gonna be in Turkey tomorrow…We're gonna delete everything

---

[14] Based on the context of this call, law enforcement believes "tazkiyah" appears to refer to an endorsement by a member of ISIS.

off of our phones except your contact…you're gonna be the middle-man…They have warrants. They're looking for us right now. We need to leave urgently before this gets bigger…I'm deleting all my apps…I'm gonna change your name on my phone so it seems like you're a normal dude…I'm gonna delete our messages…I know those ikhwa.[15] They connect you…If one brother gets caught, all of them get caught…They were planning to do something. I'm not gonna say what, but do something here. I used to speak with those ikhwa [brothers], basically. They arrested them, and they are going for us as well, so we need to leave immediately and urgently…I need to leave. I need to get out right now…

The next day, on or about November 4, 2025, after communicating with Jimenez-Guzel and other co-conspirators, Mirreh obtained a ticket for a flight from Seattle-Tacoma to Istanbul, Turkey to depart on or about November 5, 2025. Meanwhile, Jimenez-Guzel traveled to Newark Liberty in advance of his booked flight. He was arrested at Newark Liberty while in possession of, among other things, a cell phone, a fanny pack that contained his Spanish and U.S. passports, $290 in cash, a solar charger, a universal power adaptor, and a backpack that contained two tactical pouches that are designed to attach directly to vests, backpacks, and other tactical gear. A subsequent search of Jimenez-Guzel's phone, conducted pursuant to a search warrant, revealed that on or about that date, Jimenez-Guzel received a booking confirmation email including a boarding pass for bus travel on November 7, 2025 in Turkey, from Istanbul to Gaziantep. Mirreh was arrested later that evening at his home in Washington State, admitting to the FBI in a post-arrest Mirandized interview that he had developed plans with Jimenez-Guzel (whom Mirreh knew by a known kunya or alias) to travel abroad to join ISIS.

A search of Jimenez-Guzel's residence in Montclair, New Jersey, conducted pursuant to a search warrant, revealed, among other things, that Jimenez-Guzel possessed a gun holster, tactical vest, and camouflage shirt in the basement where he would stay when visiting his mother.[16] The gun holster was found in a dresser drawer, and the tactical vest was found in a box near a tv stand. Below are pictures of the items:

---

[15] "Ikhwa" is an Arabic term that means "brothers" or "brotherhood."

[16] Jimenez-Guzel's mother told the FBI that Jimenez-Guzel would stay in the basement when he visited her. The FBI also found male clothing, among other things, that further indicated that Jimenez-Guzel resided there.







Furthermore, during a search of Jimenez-Guzel's dorm room, which was executed pursuant to a warrant, law enforcement found a notebook on Jimenez-Guzel's desk which included handwritten information such as: the names "Athari" and "Bukhari" (the Michigan attack plotters) and their phone numbers, and Mirreh's first name and phone number. The notebook also had several references to "jihad" including, but not limited to, pages labeled "Defensive Jihad," "obligation for jihad," and "Instances when it is permissible to kill women, children, the elderly, monks, and others."

## IV.    Legal Standard

The Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, governs the pre-trial release or detention of a defendant. Under the Act, after a hearing, a defendant must be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Government bears the burden of demonstrating by clear and convincing evidence that the defendant is a danger to the community and/or demonstrating by a preponderance of the evidence that the defendant is a flight risk. *See United States v. Orozco*, 2025 WL 1502149, at *2 (D.N.J. May 27, 2025).

In determining whether pre-trial detention is warranted, a court must consider the following four factors:

1. the nature and circumstances of the offense charged, including among other things, whether the offense is "a Federal crime of terrorism";

2. the weight of the evidence against the person;

3. the history and characteristics of the person, including—

   a. the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

   b. whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

4. the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*See* 18 U.S.C. § 3142(g).

The Court has broad discretion to determine how much weight to assign the factors listed in Section 3142(g) based on the circumstances of a particular case. As the Second Circuit has instructively explained:

> [a]lthough § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant ... That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

*United States v. Zhang*, 55 F.4th 141, 149-50 (2nd Cir. 2022). If, after weighing these factors, the Court concludes that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community," then bail should be denied. *See id.* § 3142(e)(1).

As relevant here, Congress has also determined that certain terrorism-related crimes, including the charges set forth in the Complaint, are so serious that there is a rebuttable presumption of detention in such cases. *See id.* § 3142(e)(3)(C) (applying a rebuttable presumption of detention for "an offense listed in section 2332b(g)(5)(B)

16

of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed[.]") The offenses with which Jimenez-Guzel is charged are listed in Section 2332b(g)(5)(B) and each carry a maximum term of 20 years' imprisonment, thus triggering the presumption of detention. Where there is a rebuttable presumption of detention, as there is here, the defendant may rebut this presumption by presenting "some credible evidence forming a basis for his [or her] contention that he [or she] will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). However, the burden of persuasion regarding risk-of-flight and danger to the community remains with the Government. The Government has the burden of showing danger to the community by clear and convincing evidence, but risk-of-flight may be supported by a preponderance of the evidence. *See United States v. Himler*, 797 F.2d 156, 160–61 (3d Cir. 1986).

## V.    Analysis

Here, Jimenez-Guzel has not rebutted the presumption of detention. The defense's arguments against detention are mainly mitigation-related claims about medical issues he has faced and information about his family background — circumstances that were present when he committed the charged offenses—as opposed to evidence that he is not a risk-of-flight or danger to the community. Jimenez-Guzel should remain in the custody of the USMS, as he poses a very serious flight risk in that he has already attempted to leave the country immediately before his arrest even before facing serious criminal charges, and he also has family overseas in Turkey. Jimenez-Guzel also poses an extreme danger to the community given his stated intent to act violently against others in the United States and support others who do, in addition to his charged conduct relating to his attempt and conspiracy to travel abroad to join ISIS and commit violent acts.

As explained below, even assuming that enough evidence is put forward to rebut the presumption of detention, that presumption "does not disappear from the case," but rather, "it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *United States v. Chagra*, 850 F. Supp. 354, 358 (W.D. Pa. 1994) (internal quotation omitted). Combined with the presumption, an evaluation of the aforementioned factors mandates detention.

## A. Nature and Circumstances of the Offenses Charged

In listing the "nature and circumstances of the offense charged" as a criterion in the detention analysis, the Bail Reform Act specifically provides that the Court is to consider whether the crime charged is, among others, a crime of violence or a Federal crime of terrorism. See 18 U.S.C. § 3142(g)(1). The charged offense falls

within this category, confirming that Congress viewed this crime as sufficiently serious to factor against release on bond.

Indeed, as set forth above, Congress recognized the seriousness of these charged offenses by specifically enumerating 18 U.S.C. § 2339B among those offenses that carry a presumption that no condition or combination of conditions will be sufficient to permit a defendant to be released on bond. Even where a defendant can rebut this presumption, the Court is still required to give some weight to the presumption in the detention analysis, "keeping in mind that Congress has found that these offenders pose special risks" and that "a strong probability arises that no form of conditional release" will assure the defendant's return to court or adequately protect the community. *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986) (citation and internal quotation marks omitted).

As the defense has no choice but to acknowledge, the offenses charged are very serious. Jimenez-Guzel's intentions and acts were dangerous: he not only conspired, but also attempted, to provide himself and others as material support to ISIS, an FTO that continues to plot attacks against the United States and its people. *See United States v. Sheikh*, 994 F. Supp. 2d 736, 740 (E.D.N.C. 2014) (citation omitted) (describing a federal crime of terrorism as "not a common violent crime, but rather terror that rips civilization's fabric" and an allegation that "weighs heavily against the defendant" where the defendant was charged with attempting to provide material support to an FTO). While the defense characterizes Jimenez-Guzel's behavior as "grandiose role-playing" (Def. Br. at 8), his actions indicate otherwise.

In its motion, the defense cherry picks a handful of cases involving terrorism charges where defendants were released on bond, but such cases are the exception, not the norm. *See, e.g., United States v. Abdisatar Ahmed Hassan*, 25-cr-165 (D. Minn.), D.E. 20 (ordering pretrial detention of defendant charged with attempting to provide material support to ISIS after he attempted to board flights to reach ISIS-held territory, despite that fact that defendant was "young, has strong family and community ties, and appears to [be] engaged in a significant amount of pro-social programming in just the short time he has been detained."); *United States v. Syed Aman*, 24-cr-599 (E.D.N.Y.), D.E. 2 (ordering pretrial detention of defendant charged with attempting to provide material support to ISIS after his arrest at the airport attempting to board a flight for Qatar, to eventually join ISIS in Syria); *United States v. Mashkoor*, 24-cr-18 (D. Colo.), D.E. 15 (ordering pretrial detention of 18-year-old charged with attempting to provide material support to ISIS after his arrest at the airport attempting to board a flight to the United Arab Emirates, en route to Afghanistan or Syria to fight for ISIS); *United States v. Aws Naser*, 22-cr-20504 (E.D. Mich.), D.E. 193 (ordering pretrial detention for defendant charged with attempting to provide material support to ISIS and being a felon in possession of a destructive device); *United States v. Maria Bell*, 21-cr-15 (D.N.J.), D.E. 5, 17 (ordering pretrial detention of 53-year old woman charged with providing material support to the FTO

18

al-Nusra Front based on her transfer of money to individuals in Turkey and Syria who supported the group). Indeed, Jimenez-Guzel's co-defendant and co-conspirator, Mirreh, was ordered detained after a detention hearing in the Western District of Washington, where he was arrested, based on allegations of largely overlapping conduct. *United States v. Saed Ali Mirreh,* 25-mj-708 (W.D. Wash.), D.E. 8 (finding that while Mirreh "has strong family ties, stable housing, and has many ties to the jurisdiction" that rebutted the presumption that no condition or combination of conditions would reasonably assure his appearance, he "poses a risk of danger due the nature of allegations against him…").

With respect to the other cases the defense cites, *see* (Def. Br. at 13-16), to the extent that the defense suggests that any of these other cases are instructive with respect to this Court's determination as to the seriousness of Jimenez-Guzel's offenses and danger to the community, the Court should reject this invitation to compare apples and oranges. The Court's determination on those issues here "must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant." *United States v. Tortora,* 922 F.2d 880, 888 (1st Cir. 1990) ("No two defendants are likely to have the same pedigree or to occupy the same position."); *see also United States v. Traitz*, 807 F.2d 322, 325 (3d Cir. 1986), cited by (Def. Br. at 7). Thus, whether other defendants may have successfully rebutted the presumption of detention in Section 3142(e)(3) and been ordered released on bond should not tilt the Court's analysis for this defendant.

The cases the defense cites for the unremarkable proposition that detention for charged terrorism offenses is not automatic are all distinguishable from the case at hand, in any event:

- ***United States v. Mattis*, 963 F.3d 285 (2d. 2020):** In *Mattis*, the defendants were charged with destroying property by means of fire or an explosive in violation of 18 U.S.C. § 844(i), not attempting or conspiring to provide material support or resources to an FTO like Jimenez-Guzel. One of the *Mattis* defendants was alleged to have thrown a Molotov cocktail into an unoccupied and already vandalized police vehicle, with the other individual acting as a getaway driver, during the protests in New York and nationwide in late May 2020. The Second Circuit found that whether the district court committed clear error in granting defendants bail was a "closer question," *id.* at 292, finding it significant that, unlike in this case, there was no evidence the defendants "were members of an organized criminal or terrorist organization, who plotted over a period of time…," nor was there evidence that "they engage[d] in extensive surreptitious planning." *Id.* at 295. Rather, the Second Circuit found that—unlike Jimenez-Guzel's charged conduct here—the *Mattis* defendants' "actions were undertaken during a massive public protest, in which emotions ran high" and that there was "no indication that the defendants [were] likely to engage in similar acts outside the context of that particular night." *Id.*

19

- ***United States v. Kyse Abushanab*, 25-cr-137 (D.N.J.):** Abushanab was released on bond with the consent of the Government, after pleading guilty to an information charging him with the concealment of material support to terrorism under 18 U.S.C. § 2339C. Abushanab's criminal conduct, which consisted of sending ISIS propaganda and distributing information regarding how to make explosives, dated back several years, and there was no evidence at the time of his release that he had recently engaged in criminal conduct, or that he actually possessed any explosives or weapons. Jimenez-Guzel is facing charges under Section 2339B with greater punitive exposure than the charge to which Abushanab pled guilty, and for conduct that relates to his very recent conspiring and attempt to join ISIS as a fighter.

- ***United States v. Halima Salman*, 24-cr-206 (E.D.N.Y)** Unlike Jimenez-Guzel, who was charged with violating Section 2339B and arrested at the airport after plotting and conspiring with other ISIS supporters over the course of months to travel to ISIS-held territory abroad, Salman was charged with receiving military-type training, in violation of 18 U.S.C. § 2339B, between 2017 and 2019 when she was living in Syria with her family, five years before her 2024 initial appearance in the United States. Moreover, when Salman was charged and repatriated to the United States to face prosecution, she had already spent the preceding five years in a foreign detention camp in Syria following her capture by foreign authorities.

- ***United States v. Hashimi, et al.*, 22-cr-533 (E.D.N.Y.):** Unlike Jimenez-Guzel, the two defendants in this case who were granted bail were charged with fundraising and contributing money to ISIS members abroad, but there was nothing in the complaint suggesting that those defendants sought to join ISIS as fighters, or that they were aware of or considered assisting potential attacks in the United States. Their co-defendant, Hashimi, was more similarly situated to Jimenez-Guzel, since Hashimi was alleged to have conducted online searches for explosives and firearms and telling an FBI source that he wanted to join ISIS in Afghanistan, *see Hashimi*, 22-cr-533, D.E. 40. Notably, Hashimi was detained pending trial. *Id.*, D.E. 22.

- ***United States v. Shahidul Gaffar and Nabila Khan*, 20-cr-392 (E.D. Pa.):** Both of these defendants pled guilty to violating 18 U.S.C. § 371 (not Section 2339B, itself) by conspiring to provide material support to ISIS *before* they were released on bond. In addition, many of the filings on the docket remain redacted or under seal because of the court's finding that "disclosure of information relating to cooperation efforts in this case will work a serious injury to those who assisted or attempted to assist the government." *See Gaffar et al.*, 20-cr-392, D.E. 71 at 5. Of course, Jimenez-Guzel has pled not guilty to the charges in the Complaint and is not cooperating with law enforcement.

- ***United States v. Delowar Hossain*, 19-cr-606 (S.D.N.Y.):** Contrary to the summary provided by the defense in the instant motion, the complaint against Hossain did not include allegations that he was in contact with actual Taliban members, although it referenced evidence he had researched the Taliban online. Rather, the allegations in the complaint against Hossain were focused on Hossain's communications with an FBI confidential source, who represented to Hossain that he would be Hossain's travel companion. Here, on the other hand, Jimenez-Guzel claimed to have interacted with an actual smuggler in Turkey only months before his arrest, also telling his co-conspirators that the smuggler could facilitate their passage to ISIS-held territory in Syria. And to be clear, as the Complaint against Jimenez-Guzel lays out, Jimenez-Guzel was a leader, if not the main leader, of a conspiracy that included other individuals in the United States and overseas (not just law enforcement undercovers) who intended to coordinate their travel, regroup in Syria, and join ISIS as fighters.

- ***United States v. Kim Anh Vo*, 19-cr-223 (S.D.N.Y.):** Vo was granted bail only after she pled guilty, and the Government consented to her release at the time because it was considered necessary to allow for assessments regarding Vo's suitability to participate in a particular government-created early engagement program then in existence (not the "Parents for Peace" program). Given the onset of the COVID pandemic at the time Vo's motion for release was decided in March 2020, the Government specifically indicated that it was consenting so as to allow for Vo to meet with counselors and FBI personnel in both New York and Georgia. *Vo*, 19-cr-233, D.E. 24. These were unique circumstances not present here.

The nature and circumstances of the offenses charged here, as described in the Complaint and herein, weigh strongly in favor of the continued detention of Jimenez-Guzel.

### B. The Weight of the Evidence

The weight of the evidence against Jimenez-Guzel is strong. The charges against Jimenez-Guzel were brought after a year-long investigation that relied upon, among other things, recorded audio and video calls and written communications, law enforcement surveillance, grand jury subpoenas, and search warrants. Jimenez-Guzel's co-conspirator, Mirreh, has admitted that their conspiracy existed and its object in a post-arrest Mirandized interview.

Notably, Jimenez-Guzel is charged with *conspiring* to provide and an *attempt* to provide material support to terrorists. As a result, whether Jimenez-Guzel actually provided material support or would have been able to provide such support is immaterial. *See United States v. Mehanna*, 735 F.3d 32, 53 (1st Cir. 2013)

(recognizing in a terrorism-related case that factual impossibility is not a defense for offenses such as conspiracy or attempt); *United States v. Mohamed*, No. CR-19-02162-TUC-JGZ, 2024 WL 3595651, at *3 (D. Ariz. July 31, 2024) (stating that in a case where, similar to Jimenez-Guzel, the defendants were charged with conspiring and attempting to provide themselves as personnel to ISIS by traveling to ISIS-held territory from the United States, "[w]hether the conspiracy was factually possible is not an element that the Government must prove beyond a reasonable doubt. Moreover, factual impossibility is not a valid defense to the charged offenses.").

## C. History and Characteristics of Jimenez-Guzel

Jimenez-Guzel's history and characteristics likewise mandate continued detention. Jimenez-Guzel first interacted with the FBI over a year before his arrest. As detailed in the Complaint, Jimenez-Guzel and his mother, who were residing together at the time, were interviewed by the FBI regarding a concerning post that he made on a social media platform. Indeed, Jimenez-Guzel was interviewed on two separate occasions, and Jimenez-Guzel's father, who resides in Maryland, was also telephonically interviewed.

On or about October 4, 2024, Jimenez-Guzel and his mother were interviewed by the FBI regarding an October 2, 2024 post in which he suggested that a newsworthy event would be occurring in Boston. *See* Exhibit A, ¶ 14. In particular, Jimenez-Guzel's post stated: "Ameeica [sic] is next. In 2 weeks, we will be all over the news in Boston[.]" *See id.*, ¶ 15. Jimenez-Guzel was subsequently interviewed on or about October 8, 2024. Notwithstanding his interaction with law enforcement, Jimenez-Guzel, while under the supervision of his parents, did not alter his behavior and instead, he continuously described violently attacking other individuals, sent threatening messages to others, and escalated by ultimately engaging in the charged conduct.

For example, about six months after being interviewed by the FBI, on or about April 8, 2025, Jimenez-Guzel sent a message in a group chat on another social media platform stating that he needed to find another user's ("Individual 1") address. He then stated: "I'm more horny to unalive hjm [sic] "[t]han anything," and sent four skull emojis,[17] depicted as follows: "💀 💀 💀 💀." About two days later, on or about April 10, 2025, Jimenez-Guzel sent another message, stating in sum and substance, that he believed he may have found Individual 1's address. He then stated, in sum and substance, that Individual 1 was in Canada and that he would try to find out in what city Individual 1 resided. Later that day, Jimenez-Guzel sent another message,

---

[17] An emoji is a small image, symbol, or icon used in text fields in electronic communication to express the emotional attitude of the writer, convey information succinctly, communicate a message playfully without using words, etc. *See* https://www.merriam-webster.com/dictionary/emoji.

stating: "I'm about to" "[k]ill someone[.]" and "I'm going to the local synagogue." He subsequently sent separate messages, stating the following:

- "I'm gonna crash iut [sic]"[18]
- "On a jew"
- "I'm finding a jew"
- "Rn"[19]
- "Fuck quburis"[20]
- "I wanna murder all of them"
- "I'm gonna go to Iraq"
- "And kill a shia."[21]

The next day, on or about April 11, 2025, Jimenez-Guzel sent a message stating, in sum and substance, that he was going to find Individual 1 and asked if anyone in the group chat was in Canada. Jimenez-Guzel then stated, among other things, that another user ("Individual 2") had Jimenez-Guzel's address. Jimenez-Guzel subsequently sent separate messages, stating the following, among other things:

- "I'm so happy"
- "I want to see [Individual 2]"
- "So I can rip his skull"
- "I'm gonna torture him"
- "I'm so excited rn [right now]"
- "I'm gonna do a whole"
- "9 hour"
- "Roller coaster"

Jimenez-Guzel also stated, among other things: "I'm always strapped,"[22] "I love violence," and "[i]t's hard to control it . . . my first ever gun I shot was a 50 cal sniper."

Among other messages, Jimenez-Guzel sent the below image of an individual, whose face is blurred, but whom appears to be Jimenez-Guzel, wearing a shoulder

---

[18] Law enforcement believes that the user meant "crash out" which is a phrase that means to lose control and become angry or upset.

[19] Law enforcement believes that "rn" is an abbreviation that stands for "right now."

[20] Law enforcement believes that "quburis" is an Arabic word that means grave worshippers, which is a form of idolatry forbidden by Islam.

[21] Law enforcement believes that "shia" refers to a follower of a branch of Islam.

[22] Law enforcement believes that "strapped" is slang for carrying a firearm.

holster that is designed to conceal and carry firearms, and holding a knife upright in his left hand while raising his right index finger:[23]



On or about April 19, 2025, Jimenez-Guzel sent direct messages to Individual 2 on a social media platform. Among other things, Jimenez-Guzel sent the below image of firearms to Individual 2 and stated: "[t]hat's what coming to u [you]."



He also sent separate messages, stating the following, among other things:

- "I hope u [you] saw that pic"
- "I'm gonna rape u [you]"
- "Like full rape"
- "Ass rape"
- "I'm sending 10 ppl rn [right now]"

---

[23] As previously stated, this is a gesture often used by ISIS supporters and in ISIS propaganda.

- "I'll rape ur [your] brown cheeks"
- "The [sic] cut"
- "Ur [Your] dick off"
- "Make u [you] eat it"
- "Then I'm gonna piss in a cup"
- "And ur [you're] gonna drink it"
- "Like a good slut"
- "I'm gonna cut ur [your] micro penis[.]"

Jimenez-Guzel later reiterated that he was going to rape Individual 2, stating, among other things:

- "I'm gonna rape all 5'7 of u [you]"
- "I'm gonna rape u [you]"
- "In front of ur dad[.]"

According to Individual 2, on a social media platform, Jimenez-Guzel stated, in sum and substance, that he sent money to the Al-Hol ISIS refugee camp, which is located close to the Syria-Iraq border and holds many ISIS members detained or captured when ISIS lost much of its territory in Syria and Iraq in 2018 and 2019. Jimenez-Guzel also stated that some of his family members are known ISIS fighters.

The next month, on or about May 22, 2025, Jimenez-Guzel sent a message to another user ("Individual 3") stating in sum and substance, that he was going to get a gun license, and would be using Individual 3 as a reference for the license. He also stated that he "[m]ight get an uzi,"[24] and he would "get the smallest smg."[25]

On or about May 25, 2025, Jimenez-Guzel sent a message to Individual 3, stating in sum and substance, that he had two knives—a switch blade and a hunting knife—both of which were "murder weapons . . . [m]eant for stabbing." Within the same conversation, he also stated "I[']m finishing this" and sent the below photograph:

---

[24] Law enforcement believes "uzi" refers to a type of submachine gun.

[25] Law enforcement believes "smg" is an acronym for submachine gun.



Jimenez-Guzel then stated to Individual 3: "[l]et's find a jew . . . A jew who was an idf [Israel Defense Forces] soldier." He then instructed Individual 3 to watch YouTube tutorials "[o]n how to stab," and discussed traveling together either in June or July and going shopping for knives.

The next day, on or about May 26, 2025, Jimenez-Guzel asked another individual ("Individual 4") in a group chat if Individual 4 wanted to go on a mission this summer, and stated "[w]e knkw [sic] where [Individual 2] lives. . . his blood is halal."[26]

At least as early as June 13, 2025, Jimenez-Guzel began expressing an interest in fighting violent "jihad." On or about that date, Jimenez-Guzel sent a message to an individual ("Individual 5"), stating that he wanted to "fight jihad." The next day, on or about June 14, 2025, he told Individual 5: "[i]f Israel and Iran collapse at eachother [sic] and a call to jihad is done[,] I'm going[.]" He continued to express his support of jihad, stating, "[r]n [right now] it's jihad mu'ayyan[27]. . . [w]hich means individual jihad . . . [s]ince the Muslim lands are being attacked. . . I've been going to the [gun] range a lot[.] And jujitsu[28] like crazy[.] I'm ready for this[.]"

---

[26] Law enforcement believes "halal" is an Arabic term meaning permissible or lawful under Islamic law. Accordingly, law enforcement believes that Jimenez-Guzel was stating that Individual 2's blood was permissible to spill or drink under Islamic law.

[27] Law enforcement believes "mu'ayyan" is an Arabic term for clearly or definitely.

[28] "Jujitsu" is grappling-based martial art, combat sport, and self-defense system that focuses on taking an opponent to the ground, gaining dominant control positions, and using leverage, technique, and joint locks or chokeholds to force a submission.

Notably, Jimenez-Guzel was living with his mother and occasionally visiting his father, both of whom are proposed custodians, during most of the relevant time frame for the conduct charged in the Complaint and further described herein.[29]

## D. Danger to the community and risk of flight

Jimenez-Guzel is a danger to the community. He is comfortable with extreme violence and has expressed a desire to fight and die for his cause, commit violent attacks against specific individuals and groups of individuals such as unbelievers or Jews, has experience with knives and firearms, and has physically trained for combat. He has also expressed a willingness to commit violence in the United States, particularly if he is prevented from traveling abroad, saying: "if they take your passport, and you can't leave the country, I'm doing, I'm doing what Athari is gonna do, if that happens," and abroad such as volunteering to commit beheadings in support of ISIS. *See Sheikh*, 994 F. Supp. 2d at 741 (finding the defendant to be a danger to the community in case where the defendant attempted to travel abroad with the intent to engage in violence there).

Jimenez-Guzel is also a flight risk. As previously stated, he was arrested at Newark Liberty while waiting for a flight to Turkey. The flight to Turkey was not only one of his final steps toward achieving his goal of joining ISIS, it was also a way to flee from law enforcement after finding out that he and his co-conspirators were mentioned in the EDMI complaint and was therefore on law enforcement's radar. Also, because Jimenez-Guzel faces a substantial prison term upon conviction of the charged offenses—a maximum of 20 years' imprisonment and a supervised release term of life on each count—he has significant motivation to flee, and no set of release conditions can adequately assure that he will remain within the jurisdiction. To be sure, "electronic monitoring and home confinement do not guarantee that [a] defendant will not flee or endanger the community," as "[e]lectronic monitoring impedes but does not prevent a defendant from fleeing." *United States v. Abdullahu*, 488 F. Supp. 2d 433, 444 (D.N.J. 2007) (citing *United States v. Orena*, 986 F.2d 628, 632-33 (2d Cir. 1993) and *United States v. Gotti*, 776 F. Supp. 666, 672-73 (E.D.N.Y. 1991)).

Indeed, in *U.S. v. Sheikh*, where, similar to Jimenez-Guzel, the defendant was arrested at the airport on a charge of attempting to provide material support to an FTO and had family overseas, the District Court concluded that the defendant posed a risk of flight, explaining:

> [t]he nature and circumstances of the charged offense contain an intent to travel overseas. Defendant is familiar with such travel and has family members overseas. Aside from fleeing the country, defendant has a

---

[29] As previously mentioned, Jimenez-Guzel was in Turkey from July 4, 2025 to August 20, 2025, believed to be visiting his extended family.

strong incentive to not appear for future hearings. The charges are serious, the evidence is strong and defendant faces up to 15 years' imprisonment.

994 F. Supp. 2d at 742.

Jimenez-Guzel remains a significant danger to the community and a substantial flight risk, continued detention is warranted.

## VI.    Jimenez-Guzel's Proposed Conditions for Release are Insufficient.

Jimenez-Guzel proposes that he be released to live with his father in Maryland, while his mother moves to a nearby location. This is insufficient to ensure the safety of the community and ensure that Jimenez-Guzel does not flee.

As previously mentioned, Jimenez-Guzel's mother and father were separately interviewed by the FBI in October 2024 when Jimenez-Guzel made an online post suggesting that a newsworthy event would be occurring in Boston. Jimenez-Guzel's conduct, however, did not abate; rather, it got worse. Additionally, Jimenez-Guzel was living under his mother's roof during a majority of the alleged conduct, including when he traveled to Michigan, and would return to her home on the weekends on a nearly weekly basis after moving to his college dorm in late August 2025. When interviewed by the FBI, Jimenez-Guzel's mother stated that she did not know who Jimenez-Guzel was staying with in Michigan. She was unable to prevent his terrorist conduct before, and she will be unable to prevent it now should he be released.

Moreover, Jimenez-Guzel would also visit his father during this time period. For example, based on FBI surveillance and lawfully obtained cell phone location data, Jimenez-Guzel was at his father's house when he returned from Turkey—from on or about August 20, 2025 to on or about August 24, 2025, and from on or about October 31, 2025 to on or about November 3, 2025. During these time periods, Jimenez-Guzel continued discussing his plans to join ISIS and accelerated his travel plans. Notably, November 3, 2025 is the day that the EDMI complaint was unsealed, the day that Jimenez-Guzel re-booked his flight, and the day that he said he "need[ed] to leave." So his father is not able to prevent his terrorist conduct either.

Jimenez-Guzel also proposes that he get "monitored internet access" and "may have access to only one Internet-enabled electronic device, which will be monitored by Pretrial Servies, and he may not access social media." (Def. Br. at 2, 3). Given that Jimenez-Guzel's conspiring occurred largely through electronic communication, Jimenez-Guzel should not have access to *any* device with internet or communication ability. Furthermore, that condition of release is nearly impossible to enforce. *See United States v. Schenberger*, 498 F. Supp. 2d 738, 744–45 (D.N.J. 2007) ("Although

defendant will agree not to use or access a computer, this condition of release is difficult to enforce. The ubiquitous presence of the internet and the all-encompassing nature of the information it contains are too obvious to require extensive citation or discussion.") (internal citation omitted).

Finally, Jimenez-Guzel suggests a non-standard condition which is that he participate in a program administered by Parents for Peace, or another suitable deradicalization program as directed by Pretrial Services. (Def. Br. at 3). Jimenez-Guzel describes the organization as "a highly-regarded not-for-profit organization that has been providing services to meet this need for alternative and diversion strategies in cases involving extremism," and that it consists of an "alliance of parents of extremists, former extremists, survivors of extremism, researchers, and clinicians with significant experience with and dedication to compassionate de-recidivism work in terrorism cases." *Id.* Notably, Jimenez-Guzel argues that he was a "misguided, immature teenager" who "had no intention of ever hurting anyone." *Id.* at 1, but then suggests, on the other hand, that the deradicalization program offered by Parents for Peace could somehow have an impact on him. He is wrong either way. As demonstrated by the months of his concerning conduct described above and in the Complaint, his radicalization leading up to his arrest is real and deep—not some youthful fantasy. And for the same reason, no diversion program will be sufficient to ensure that a radicalized defendant like Jimenez-Guzel will not remain a threat to the public if released on bond.

## VII.    Conclusion

For the foregoing reasons, the Government respectfully requests that, as recommended by Pretrial Services, the Court deny Jimenez-Guzel's request for pretrial release. Continued detention is necessary, as there are no conditions, or

combination of conditions, that will sufficiently protect the community and assure Jimenez-Guzel's appearance at trial.

Respectfully submitted,

TODD BLANCHE
U.S. Deputy Attorney General

PHILIP LAMPARELLO
Senior Counsel

*/s/ Camila A. Garces*
Camila A. Garces
Assistant U.S. Attorney

cc:   Deirdre von Dornum, Esq.
      Alexandra Conlon, Esq.
      Krista Staropoli, Esq.

      *Counsel for Jimenez-Guzel*

      Sophia Morrone

      *United States Pretrial Services Officer*